And I hope I say this right, the Unkechaug Indian Nation v. Seggos, 23-1013. Good morning. Good morning. May it please the court, my name is James Simmermeyer and I represent the Unkechaug Indian Nation and Harry Wallace, individually and as chief of the Unkechaug Indian Nation. I've attempted to focus on several issues that are brought by the appellants on the appeal. One is the failure of the district court to perform its gatekeeping function by not ruling on the deliberate motions. Failure of the district court to perform in-camera inspection of Appellate 4780 alleged privileged documents submitted to the court on May 10, 2019. And failure of the district court not to properly analyze the Anjos Treaty's text to understand the historical context and apply the Indian canon understanding of the treaty. The first instance, the failure of the court not to make a ruling on Dalbert. Excuse me, Mr. Simmermeyer, I'd like you to address, if you would, why that matters. I mean, let's assume that I believe that it is sort of poor practice for a district judge to leave motions hanging and not even address the fact that he's not going to rule on those motions. Let's assume that that's poor practice. But how does that make a difference to the ruling? In other words, unless the judge relies on facts or opinions asserted by an expert whose admissibility as an expert is challenged, why does it make a difference? If the judge had just said, I don't need to rule on the Dalbert motions because I'm not going to rely on either side's experts. Well, in fact, the judge did rely on the expert produced by the appellees. How did he do that? How did he do that other than by saying that there were documents attached, which the judge took note of and relied on, but was the authenticity of those documents or the relevance of those documents challenged? Yes, they were. What was the challenge? The challenge was made that the documentation that she submitted and the information that the judge relied on was something that was not scientifically sound. It was documentation that we challenge in our motion papers that were hearsay information, unscientific, and it was something that she herself did not discover or put together. It was something she had heard from or spoke to colleagues who advised her that these were the statistics. And the statistics that also were relied on by the judge and by the expert were documentation from 2014 that was just updated and nothing new or nothing accurate was produced by the experts. And those statistics were about what? I thought the experts were testifying about the back history of the treaty and things of that sort. These are statistics about eels? Well, the expert that was relied on by the court was Tony Kearns, who was their expert as to the fishing and the eels. So just to clarify, this is the testimony that was arguably relevant to the conservation necessity argument, not the whether there's a treaty and what it says. Yes, yes. But isn't the, I mean, all right, if you want to spend your time talking about the conservation necessity, that's fine, but isn't the first ruling that the court made, and the one that would be dispositive of the case in any event, is that this is not a treaty of the United States? Isn't that the principal issue that's before us? Yes. Because if it isn't a treaty of the United States, then I'm not sure what's left of your arguments. Well, two things. It's a 1676 treaty that the judge tried to argue that was, there's no in your bigot, wasn't ambiguous. Well, however, you know, 1676 treaty, 1676 treaty, English colony and Old English, wasn't analyzed properly by the court because the court, several things, it failed to, it didn't take into account the entire language of the treaty. Is the United States bound by a treaty? Let's assume it is a treaty. Yes. Not just a unilateral declaration by the governor. That was a treaty that was made by the king's officer. Yes. The king of England's officer. Yes. Where does that become the supreme law of the United States? Well, historically, the treaties of Indians in New York State have been accepted, blanket exception, and accepted until today. As a matter of fact, the proof that we submitted, the evidence we submitted to the court, which it didn't look at, was letters and documentation from the state of New York acknowledging the Unkachug Indians since colonial times. And also in the documentation that we submitted to the court, which the court ignored, was the only way in which the state of New York identifies Indian tribes is through colonial relationships. So this is something that's been blanketed, and since the exception of the United States, to accept Indian relationships as well as land relationships from the Constitution, protecting such relationships, including our arguments concerning the land issues and whether or not the land issues can be terminated by a state or by an individual after it's been, since its colonial times. And the courts have held that it can't be. It's the same thing with patents. Patents and ownership of land is also dated back to the colonial time. It's not something that was more recent. It has to relate back the same way Indian relationships do. Can I break this down and make sure I understand? Because where we got into this was your concern that the court ruled on the summary judgment motion without deciding whether the strong testimony was going to be part of the consideration. And my colleague has raised the question, well, if this wasn't a treaty of the United States, it doesn't matter. And there's two ways to get to this wasn't a treaty of the United States. One is the court's finding that it wasn't a treaty at all. And your argument would be, well, wait a minute. There's a whole lot of historical evidence, including the strong testimony that tells us it was a treaty. So if we're to rely on that, we're in a mess because we don't have the Daubert ruling. But then the second way was a legal principle, which is that colonial, pre-Confederal period, colonial treaties between Indian nations and colonial councils aren't treaties of the United States under the Constitution. And so even if everything that expert strong says is right, isn't that just a purely legal question that we evaluate using principles of law and not expert testimony? No, it's not. Because historically, and the evidence is there, historically the state of New York has recognized colonial relationships with Indians. And it's been accepted and adapted by the state of New York as well as the United States. Well, that may be a state law issue. But I thought the claim was that under the supremacy clause of the Constitution, whatever New York has done here has to yield to the superior law of a treaty of the United States. Is that not your argument? It is. But you have to understand that the relationship of the tribe to the state is also, in a recent case before Judge Matsumoto in the Christides case, they found that the Unkichug Indian tribe was a federal common law in Indian Nation and they traced it back to colonial times forward, accepting the tribe as a federal recognized tribe. And by doing this, the treaties and the documents relating to that tribe become effective under the Constitution and under the protection of the United States. Can you close that? Can you help give me some law to close that with? That if this nation is recognized as a tribe from the perspective of the U.S. government as a matter of federal common law, therefore every colonial era agreement relative to that tribe now becomes the law of the U.S. Where's the case law or something that connects those dots? Well, historically, well, as a matter of fact, the common law finding was done in the Montoya, which goes back to colonial times or as far back as the court could go back, tribal relationships. And it accepted all those deeds, treaties, and agreements with the tribe. Which case is this? I'm sorry. This is Christides versus the Nkutuk Indian Nation. So it wasn't just that it recognized as a matter of federal common law that the existence of the Nkutuk Nation, but it actually held that all treaties that were executed with colonial governments are now the law of the United States. That wasn't a specific issue of it. What it was was that the Nkutuk Indian Nation traces its heritage and its relationships back to the English colony, which was then transferred to the state of New York when it became a state. And all of those things were blanketly accepted by the colony and the state of New York. This is the decision of the Eastern District of New York in 2009, 660 F sub 2nd, 442. That's the case referring to Christides. So one of the things I'm concerned about, and we've got these jurisdictional issues, and clearly it's in our purview to adjudicate the relationship between this, what may be a treaty in the United States. Do we have the authority to adjudicate the question of whether the state of New York has any binding commitments by virtue of this treaty or this document? I think it traces itself back, the history of it, just like it does now with certain cases of property cases that we mentioned, the Dartmouth case and other cases where the colonial relations and the property transfers are bound today by the United States because of that. And we believe that that same blanket authority relates to the Nkutuk and all their relationships to the colonial times to present, including the same thing as a land transfer. It's an agreement that should be protected and should not have been interfered with by the DEC. So let's assume for a minute that we conclude that the district court erred by not bringing in the strong testimony. And had it done so, it would have concluded that this was a treaty. And let's assume that we agree with you on this legal argument that it was, therefore, become law of the United States. I was struck that the strong testimony seemed to support the proposition that the meaning of that treaty was that the nation enjoyed the fishing rights on equal footing with everyone else, subject to the same restrictions and limitations. And so I'm wondering whether even if you overcame all those hurdles, you run up against the problem that this doesn't violate the treaty as understood by your own expert. Well, it does. I think the interpretation of the court by the treaty, without using the Indian canons to look at it most freely in light of how the Indians would have perceived it, there's no opportunity to even analyze the treaty. And the courts have, in the Goble case, have broken down specifically the same type of language in treaties with Washington in the Vessel case where it talks about the customs and the practices and then their rights being the same as citizens. But the Supreme Court realized that you had to look at the context of the language as well as the backdrop of why the agreement was entered into and what the rights were of the tribe in terms of how they saw it. And, again, you know, there was no anticipation at this time in 1676. But it was your expert. Maybe I'm misreading the opinion, and you can correct me if I'm wrong, but I thought that your expert said that this is the way the Indians would have interpreted it, that this is a treaty that says that the tribe could fish unmolested so long as they complied with the same laws that applied to everyone else. I thought that was Mr. Strong's opinion. That's what he said, but the concept here is that in order to obtain how the Indians believe or what they believe, then you have to do the test. You have to be able to analyze the data. You have to analyze the language of it, and the language is very specific there, which wasn't addressed by the court, allowing the Unka Chug to fish with Christians, which is a major, major consideration in a treaty. Because, you know, up until then, you're looking at Marshall's decision when he talks about, you know, the doctrine of discovery and how the Europeans came and felt that since they brought Christianity and civilization, they could take basically what they wanted to take from the Indians, and it was justified. So you have to really look at it, those kind of factors, and look at the fact that when they allowed Indians to fish with or without Christians, that was a big deal, and that was specifically a treaty allowing them to do something that would not be common. And in John Strong's testimony as well, this wasn't a one-shot type of deal. This was something that was worked over a long period of time, and during this period of time, the backdrop was Connecticut was at war with the Indians, and the governor was afraid it was going to drift into Long Island and create a much larger problem. I understand all of that, because that's what goes to whether this is a treaty at all. Right. That background would make for that argument. All right. I think we have your arguments, and it looks like you reserved some time, so we'll go through them again. Thank you. Thank you. Ms. Brody. Good morning. Elizabeth Brody for the New York State Department of Environmental Conservation. To decide plaintiffs' federal preemption challenge, this court need only determine that the Andros Order, even assuming it is a treaty, does not come within the ambit of the Supremacy Clause, because it was not, quote, made under the authority of the United States. The Andros Order is not federal. The Andros Order could not have been made under the authority of the United States when it was signed in 1676, and the Debts and Engagements Clause, which was plaintiff's principal argument, did not transform all preexisting colonial agreements with states into agreements with the United States. Now, we asked Mr. Simmemeyer if he could come up with a case that held that a treaty made by an English royal governor became adopted by the United States and became federal law. He didn't come up with a binding one, anyway. He came up with some district court case. So I'm going to ask you the same question. Other than your reliance, and I understand the argument you're making based on the language of the Supremacy Clause, is there a case that says the United States is not bound by some alleged treaty because that treaty was made by an English crown official before there was a United States, before the Declaration of Independence, before the Articles of Confederation? Do you have a case that says that? So two cases that I think are particularly important. The first is Alliance to Save the Mattaponi, the Commonwealth of Virginia, which is cited in our brief. There, a tribe claims that a treaty with the English crown from 1677, just one year after this document, was federal law under the Supremacy Clause, and the Virginia Supreme Court rejected that claim, reasoning that the treaty- Right, and that's a case from the Virginia Supreme Court. That's a case from the Virginia Supreme Court. And the other is numerous cases from the Supreme Court and cases from this court that say that upon the Revolution, New York State and not the United States became the legal successor to agreements that the colonial government had signed. So Seneca Nation of Indians v. New York, 382 F. 3rd at 265. I'm also happy to- there are a variety of cases from the Supreme Court that support this principle. I'm happy to list them off, or I can file- Okay, but then I guess the next question is if the treaty does not become federal law, but does bind New York, does that present any problem for you? Because, you know, what is the status of a treaty that New York inherits compared to the various legislation that's in place? Is it basically under New York law? Can a treaty that New York committed itself to in some sense be overturned by subsequent statute? Is that the principle? You know, I'm not certain below we argued that when New York adopted its constitution, it did sort of decide the status of these types of treaties, but this court has no authority to reach questions about whether that treaty is binding under New York law or current under New York law or what it means under New York law because of the Pennhurst Doctrine. There's no injunction that this court could lawfully issue based on a state document. And so those questions, you know, we think there are numerous reasons to affirm the district court's opinion, but, you know, if the court, for whatever reason, is uncomfortable and wants to leave this question open, then, you know, it could certainly be resolved by a state court. Could you talk a little bit about the Dartmouth College case and why that isn't a hook for the nation to say that at least charters that predated the constitution are enforceable? Well, that case doesn't say whether that charter was enforceable against the United States. It was just enforceable against New Hampshire, and that was a contracts clause case as well. So what does it mean to say the charters, it doesn't say whether the charter is enforceable against the U.S.? I'm not sure I understand that. The debate is who has the lawful term, right? There's two competing groups of people who say they own the charter to this educational institution, and the court says, well, the ones who actually got it from England are the ones who still hold it. Yes, but I understood that case to be decided under the contracts clause and that any subsequent action that interfered with that charter was a violation of the contracts clause. I didn't understand that case to concern the supremacy clause or the debts and engagements clause. Right, now that makes sense. I guess the question then is, is there a framing of this that this is about a contract? Well, perhaps, but they did not bring a claim under the contracts clause that something- Well, they certainly cited the Dartmouth College case. They did, but they're represented, and in their complaint there were four claims alleged, two of which they appealed, both alleging that there was federal preemption based on what they allege is a federal treaty, and it's not a federal treaty. Their theory is that this was a federal treaty were, one, that there was a continuous course of dealing with New York State, and I'm really not aware of any case saying that a continuous course of dealing with a state gives rise to- Department of the Interior federal recognition process would be totally superfluous if that were all that were required. They also said that the debts and engagements clause does not transform the Endress Order into- Excuse me, they said that the debts and engagements clause transforms the Endress Order into federal law. There's simply no case law supporting that. The debts and engagements clause concerned debts of the Continental Congress, and this clause was simply intended to communicate to creditors that the debts were still valid and would still be paid. If there are no other questions about whether the treaty is federal, I'd just like to quickly move to our other arguments. First, even assuming the Endress Order is federal, it does not grant unlimited fishing rights. Instead, the order plainly states that the nation's fishing rights are subject to the law and custom of the government. Various cases that we cite in our brief from this court and from the Supreme Court state that, while the Indian construction canon may come into play if the language is ambiguous, courts are allowed to interpret the plain language of treaties- If we start reasoning about what this treaty means, don't we run into some problems when the district court hasn't ruled on the Daubert motion with respect to the expert testimony of one party as to what this treaty means? It seems like a lot of these cases involve historians coming in and sort of providing that kind of information. So critically, these cases involve historians coming in and providing evidence that the treaty did not mean what the state is arguing it means. And here, as we said in our brief, Plaintiff's own expert testified as to how the members of the nation would have understood the Endress Order at the time it was issued, which is what the Indian construction canon requires. So even crediting his testimony, even assuming you were to accept it, his testimony was that the Endress Order, excuse me, that the Nkotchak nation understood the Endress Order to subject Nkotchak fishermen to the same mercantile and common laws that governed English and Dutch colonists. This is kind of funky. I take it your principal argument is that this language is unambiguous and therefore the Indian canon does not come into play. That's correct. And therefore the historical evidence is irrelevant.  When we get to the fallback argument, though, that even if that's not right and even if the canon comes into play, now we're sort of doing our own analysis of what the expert's testimony means. Now, I realize it's something of an embarrassment to the other side that at least as I read it, the expert doesn't support the position that is being advanced about how the Indians would have understood this treaty at the time. But it's a little odd for us to start analyzing expert testimony that wasn't even admitted because the district court disclaimed reliance on it, in effect, and failed to rule on whether that expert was even qualified to give such an opinion. Now, I hear your argument that, yeah, but on its face it just doesn't say anything helpful to the plaintiffs. But it does seem a little weird to do that – for us to do that in the first instance without saying to the district court, why don't you go back and read this stuff and decide whether the expert is qualified in the first place and then in the second place, if you do think the expert is qualified, take into account what he has to say. It's a little odd for an appellate court to go there. I should clarify, our position is not that this court should undertake a de novo review of the expert testimony. Our argument is that on appellate review there's no showing of error on a motion for summary judgment because there's no showing in the record that the expert testimony creates a material issue of fact, that the treaty would have been understood a different way. The plain language argument that laws and customs of the government meant laws and customs of the government, and there's no contradictory evidence in this record. Even the evidence that is proffered would not create an issue of fact because of what it actually says. Yes, and that's all. Even assuming that the expert's testimony should have been considered. Correct, correct. I see I'm almost out of time. I'll just briefly say, even assuming this court finds that the Andros Order is a treaty of the United States, and even assuming that this court finds that the language of the treaty is ambiguous and that there is a material issue of fact with their expert's report, courts have recognized that states may still validly apply their non-discriminatory conservation-based regulations to Native American tribes. New York's regulations are undisputedly not discriminatory. No one may fish for eels that are shorter than nine inches, and no one may sell such eels. So it seems like there's at least some case law applying this conservation necessity. It gets pretty weedy on the necessity question. It doesn't just accept as a blanket proposition an assertion that this is a reasonable regulation. And I guess I'm wondering whether on summary judgment, especially with the unresolved question of the invisibility of the Cairns testimony, whether we're really in a position to affirm what should be a pretty weedy factual assessment on appeal. Well, I'll point out again that this is sort of our third-order argument and that this court doesn't even need to reach it if it just addresses the sort of threshold legal question and concludes that it's not a federal treaty. But I think this court can still affirm on summary judgment based on this record for two reasons. First, both parties relied on the scientific documents that were prepared by the Atlantic States Marine Fisheries Commission. They cited those documents, block quoted them at length in their summary judgment papers as we state in our brief. And there's no dispute fundamentally that the American eel is depleted and in need of conservation. Plaintiffs highlight different reasons that they may need conservation, but that's not a factual dispute in this record. Those same documents, again, that were relied on by both sides also concluded that less stringent measures that had been used in the past, such as a six-inch restriction, had not reversed the damage to the eel population. And so raising that size to nine inches would be both reasonable and necessary for conservation under precedent. If there are no further questions, we urge the court to affirm. Thank you. Appreciate it. Mr. Schillermeyer. If I could address the last question. We raised in our Talbot motions the testimony that from their expert that their fishing rules and regulations don't really make much sense in the sense that you can go out and any New York resident can go out and fish 25 eels before they are sexually mature, which means it depletes the population. So if a million people went out fishing, there'd be 25 million eels. So- Is that a reasonable hypothetical? I mean, I saw that argument and I thought, well, regulations make distinctions all the time between, for example, sort of commercial operations and recreational operations and things like that. And is it your view that in order to be reasonable, the regulations have to apply across the board to recreational folks and commercial equally? No, we're saying that regulation of what size eel you catch, if it's three inch, five inch, six inch. Well, it doesn't matter because if they're taken before they reach sexual maturity, that's the depletion of the population. The eels go out to the Caribbean and they reproduce and they come back and they live their life in the waters of states like New York. So by any means that an eel is depleted, the population is depleted by fishing of any kind, by the power plants, by the hydroelectric things, whatever else is going on in the state. And the Oonga Trug had a plan, a management plan, which no one looked at, no one paid attention to, where they would take the fish and move them out of danger zones. Those kind of zones where they would be depleted due to electric plants, heated water because of the different facilities that the state allows upstream as the- And I'm trying to understand where that alternative plan fits in. You're not arguing that as a matter of law, the Oonga Trug are entitled to implement that plan. You're not asserting dominion over these waters such that you're entitled to use your plan. You're just offering it to show that the state's plan's not reasonably necessary. You have something that accomplishes the same goals in your view. Exactly. Well, the plan is effective because of the documentation that we've talked about before. As well as this idea of fishing is going to deplete the population if the fishing by Indians is going to do this. What we're saying is no, it's not going to do this. The management plan is a plan in which it's consistent with preserving the eel and moving it from one dangerous area to a safe area, and it's all part of it. And you had an expert who said that your plan is better than their plan? Well, it's not a matter of better, it's just a matter of- As good. But their expert admitted that the technique of doing that is a good method and a plausible method. So it's admitted to in their deposition. All right, so to that extent, you're relying on their expert as admitting that the alternative plan of the nation is useful or somehow as rational as what the state wants done? The plan used by the management plan is one that's also used by the Indians in Maine who have- I'm trying to help you out here by trying to find an issue of fact about the, because it certainly seems to me that it's a kind of real issue of fact normally as to, if we're going to get to the level of talking about the conservation doctrine, what is a rational regulation and what isn't, and that's based on scientific information. I'm just trying to figure out, so have you got something that you are relying on that, for example, if the district court had only admitted this evidence, be it from an expert of yours or even their expert who was also not evaluated for this purpose under Daubert and should have been, that that would create the issue of fact about the reasonableness of the regulation? So that's what I'm looking for, is what evidence is there in the record that creates an issue of fact as to the reasonableness of the regulation, assuming for the sake of this question that everyone agrees that there needs to be something done to conserve endangered eels? I think the management plan itself, because it's a management plan that's been adapted by other Indian nations who have fished eels and maintained them by keeping account of them and also by the techniques they use in preserving them. Okay, I hear what you're saying. Thank you. Thank you very much. I appreciate your arguments. We'll take this case under advisement.